**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| **REHMAN MIRZA, D.C.,** | ) | Violation: |
| | ) | |
| Defendant. | ) | 18 U.S.C. § 1518 (Obstruction of Criminal |
| | ) | Health Care Fraud Investigations) |
| _____ | ) | |

## INFORMATION

The United States Attorney informs the Court that all times relevant:

### COUNT ONE

### (Obstruction of Criminal Health Care Fraud Investigation)

### The Medicaid Program

1.      Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965. Medicaid was overseen and administered by the Centers for Medicare and Medicaid Services, an agency within the United States Department of Health and Human Services ("HHS"). In the District of Columbia, Medicaid ("D.C. Medicaid") was jointly funded by the federal and District of Columbia governments and was administered by the District of Columbia Department of Health Care Finance ("DHCF"). D.C. Medicaid provided health insurance coverage to residents of the District of Columbia whose incomes were below a certain financial threshold as measured against the poverty line. Recipients of medical services covered by D.C. Medicaid were referred to as Medicaid "beneficiaries." D.C. Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f).

2. Home care agencies ("HCAs") and nurse staffing agencies ("NSAs") provided home care services, including personal care services, to D.C. Medicaid beneficiaries. Personal care services were intended to assist beneficiaries in performing the activities of daily living, known as "ADLs." ADLs were defined to include the ability to get in and out of bed, bathe, dress, eat out, take medication prescribed for self-administration, and engage in toileting.

3. Personal care services were provided by personal care aides ("PCAs"), who were employed by either an HCA, or an NSA that contracted with the HCA, to provide personal care services to D.C. Medicaid beneficiaries.

4. To be eligible to participate in D.C. Medicaid, HCAs were required to abide by all federal and local laws, regulations, and program manuals governing Medicaid payments. To receive payments from D.C. Medicaid, HCAs were required to submit claims, electronically or in paper form, to DHCF. As part of the claims process, an HCA had to identify certain information related to the provision of services including the name of the D.C. Medicaid beneficiary, the dates of service, the type of service provided to the D.C. beneficiary and the corresponding Medicaid billing code for that service, the length of time a service was provided to the beneficiary, and the amount of money being claimed for reimbursement from D.C. Medicaid. Beginning on or about July 2, 2012, the claims also had to include the National Provider Identifier ("NPI") of the physician who had prescribed the personal care services. D.C. Medicaid only paid for services that were deemed medically reasonable and necessary, and that were provided as claimed.

5. To receive personal care services covered by D.C. Medicaid, a beneficiary first had to obtain a prescription from a physician (or advanced practice registered nurse). This prescription was informally known as an "intake." D.C. Medicaid only reimbursed for personal

care services if a physician determined after a physical examination that the beneficiary had functional limitations in one or more ADLs. The prescribing physician had to have an expectation that the medical, nursing, and social needs of the beneficiary could be adequately and safely met in the beneficiary's home. Such a determination typically required a medical exam focused on the beneficiary's ability to perform ADLs, as well as questions about the beneficiary's specific living environment and arrangements. Intakes proposed the frequency and duration of PCA visits.

6. After being prescribed an intake, the D.C. Medicaid beneficiary was supposed to provide the intake to an HCA. The HCA then would assign a PCA to the beneficiary and would arrange for a registered nurse to draft a plan of care after performing an initial assessment of the beneficiary's functional status and needs. The plan of care was required to specify the frequency, duration, and expected outcome of the personal care services, and was supposed to be tailored to address the individual needs of the beneficiary. The plan of care had to be approved by a physician within 30 days of the start of the provision of personal care services by the PCA to the beneficiary, and had to be re-certified by the physician at least once every six months thereafter. The plan of care also had to be reviewed by a registered nurse at least once every 62 days, and updated or modified as needed to address the beneficiary's actual medical needs.

7. A typical intake, translated later into a plan of care, would be for eight hours of personal care services per day for five days per week, or eight hours per day for seven days per week. In the District of Columbia, over the six-month time span authorized by a single intake and plan of care, D.C. Medicaid could pay approximately $16,952 (eight hours per day with five days per week) or approximately $23,732.80 (eight hours per day with seven days per week) for personal care services provided to one beneficiary.

8. The top of the intake contained the words, in all capital letters, "DISTRICT OF COLUMBIA DEPARTMENT OF HEALTH CARE FINANCE PRESCRIPTION FORM FOR MEDICAID PERSONAL CARE AIDE SERVICES."

9. The top of the plan of care contained the words, "Government of the District of Columbia Department of Health Care Finance Division of Long-Term Care," followed by the words, "Plan of Care for Medicaid Personal Care Aide (PCA), Home Health Aide and/or Skilled Nursing Service."

10. Intakes and plans of care were only valid if signed by a licensed physician or advanced practice registered nurse, sometimes referred to as a nurse practitioner.

11. The printed instructions at the top of the intake stated that the "Physician / Nurse Practitioner (NP) is to complete all sections . . . and transmit to home health agency as the order for personal care services." Box 12 of the intake was titled "JUSTIFICATION. ORDERING PHYSICIAN / NP MUST SPECIFY." Box 13 of the intake – the certification – began with the words "SIGNATURE OF ORDERING PHYSICIAN / NP."

12. Similarly, the last page of the plan of care had a section titled "Practitioner approving Plan of Care," and the signatory line said "physician/nurse practitioner [advanced practice registered nurse]."

13. According to the District of Columbia Health Occupations Revisions Act, D.C. Code §§ 3-1201 *et seq.*, individuals licensed as chiropractors are neither physicians nor advanced practice registered nurses or nurse practitioners, and cannot practice medicine.

### Defendant and Associated Home Care Agencies

14. Defendant REHMAN MIRZA, D.C. ("**MIRZA**"), was licensed as a chiropractor in Maryland and Virginia; he was not licensed in the District of Columbia. At no time was

4

**MIRZA** ever a physician licensed to practice medicine. **MIRZA** was never enrolled as a provider in D.C. Medicaid and D.C. Medicaid did not pay for chiropractic services outside of managed care programs.

15.     **MIRZA** did not maintain offices in the District of Columbia. On or about September 11, 2012, **MIRZA** filed with the Commonwealth of Virginia articles of organization for Capital Health, LLC, a limited liability company located in 4509 Mosser Mill Court, Lake Ridge, Virginia 22192, the same business address where **MIRZA** was practicing. Beginning in or around October 2012, **MIRZA** opened an office for Capital Health under the name Capital Health Chiropractic, at 4710 Auth Place #575, Suitland, Maryland 20746. Neither Capital Health, LLC, nor Capital Health Chiropractic was licensed to do business in Maryland.

16.     ABA Home Health Care ("ABA"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

17.     American Quality Homecare Services, Inc. ("AMERICAN QUALITY"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

18.     Global Healthcare, Inc. ("GLOBAL"), a Virginia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

19.     J. D. Nursing & Management Services, Inc. ("J.D. NURSING"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

20.     Nursing Enterprises, Inc., a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

21. Ultra International Corp. d/b/a Ultra Home Health Agency ("ULTRA"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

22. Vizion One, Inc. ("VIZION"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

### Defendant Mirza's Health Care Fraud Scheme

23. Beginning in or around at least November 2012, the exact date being unknown, and continuing through in or around June 2013, the exact date being unknown, in the District of Columbia and elsewhere, defendant **REHMAN MIRZA, D.C.** did knowingly and willfully execute, and attempt to execute, and aided and abetted others in executing and attempting to execute, a scheme and artifice to defraud D.C. Medicaid, a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, D.C. Medicaid, in the connection with the delivery of and payment for health care benefits, items, and services.

*Manner and Means of the Fraud Scheme*

24. In or around November 2012, a PCA approached **MIRZA** in his office and explained that **MIRZA** could make up to $400 an hour simply by performing personal care evaluations on D.C. Medicaid beneficiaries and completing the required prescription.

25. The PCA further explained that the PCA would bring D.C. Medicaid beneficiaries to **MIRZA**'s office, and **MIRZA** agreed to set aside appointments for the D.C. Medicaid beneficiaries in exchange for cash payments.

26. **MIRZA** initially asked for and received $125 for each D.C. Medicaid beneficiary brought to his office by a PCA. Four months after he began seeing D.C. Medicaid beneficiaries,

6

**MIRZA** recognized the volume of D.C. Medicaid beneficiaries being brought to him and the importance his signature carried, and so **MIRZA** increased the size of the cash payment to $200 per visit.

27. PCAs brought numerous D.C. Medicaid beneficiaries to **MIRZA** for intakes on a weekly and sometimes daily basis. **MIRZA** accepted most of the cash payments directly from the PCAs who brought the beneficiaries to his office, not from the beneficiaries themselves. **MIRZA** recorded the cash payments he received in a receipt book. While he sometimes would record the cash as being paid by the PCA who brought the beneficiary to the office, **MIRZA** many times falsely recorded the payor as the beneficiary, even when the money in fact was given to **MIRZA** by the PCA.

28. In the description line on the receipts, **MIRZA** typically wrote "P.T. Visit," or "Eval and TX" or simply "Eval." For his few real non-Medicaid patients, **MIRZA** always described the payment on the receipt using the word "co-pay." In contrast, **MIRZA** never wrote "co-pay" for the D.C. Medicaid beneficiary receipts.

29. If a PCA brought in numerous beneficiaries at one time, the receipt would typically indicate that; for example, a receipt dated January 11, 2013, says "From: BRANDON FOBETEH," in the cash amount of $375, "for 3 patients P.T. visits."

30. When the beneficiaries came to his office, **MIRZA** collected their Medicaid insurance information, including taking a photocopy of their Medicaid insurance card. In addition, **MIRZA** would write or cause to be written the word "Med" or "Medicaid" in the appointment book next to each D.C. Medicaid beneficiary that came to the office. Sometimes **MIRZA** would write or cause to be written on the front or label of the patient file a capital "MC" for Medicaid.

31. In exchange for the cash payments from PCAs, **MIRZA** agreed to briefly "examine" the D.C. Medicaid beneficiaries. Following the examinations, **MIRZA** would typically prescribe personal care services using the D.C. Medicaid intake, would sign the certification in the box titled "signature of ordering physician," and next to his signature he added a stamp that said "Capital Health Chiropractic" and listed the business address.

32. **MIRZA**'s intakes would typically include the following diagnoses: "chronic severe back pain" or similar language, and would typically include a prescription for personal care services for eight hours a day, seven days a week, for six months. **MIRZA** wrote on many intakes that the beneficiaries could "benefit from assistance for light house work." However, **MIRZA** did not know that the only criteria for prescribing PCA services was the D.C. Medicaid beneficiary's inability to perform certain ADLs, and therefore **MIRZA** typically did not evaluate or make findings regarding ADLs.

33. **MIRZA** knew what to write on the intakes because the first PCA who brought **MIRZA** into the scheme gave **MIRZA** intakes already filled out by other chiropractors, including LEWIS LEVINE, D.C., and **MIRZA** copied language from those samples.

34. For many of the beneficiaries, **MIRZA** never created a medical file. Instead, he had a single file labeled "One Time Pts [Patients] No Files." In this file were over a hundred single-page chiropractic evaluation sheets – one for each beneficiary – that were typically left blank except for the name, date, time, and the notation "see eval," referring to the intake. For these beneficiaries, no medical record exists to support the diagnoses **MIRZA** wrote on the intakes.

35. PCAs would tell **MIRZA** to send the signed intakes via facsimile to a certain HCA. Often, the PCA would contact **MIRZA** again within a few weeks, and instruct **MIRZA** to

send the same intake via facsimile to a different HCA. **MIRZA** maintained a separate file called "facsimile cover pages for Medicaid" that contained many of the facsimiles he sent to the HCAs.

36. The PCAs would insist that **MIRZA** write the name of the PCA on the intake before it was sent to the HCA; **MIRZA** understood this was so the PCAs would receive their kickback from the HCA for each D.C. Medicaid beneficiary the PCA they brought to **MIRZA** and the HCA. It was also understood that more hours prescribed on the intake meant more money for the HCA and the PCA.

37. In many cases, after receiving the intake from **MIRZA** the HCA would prepare a plan of care for **MIRZA** to sign. Once the HCAs delivered the plan of care to **MIRZA**, typically via facsimile, **MIRZA** would sign on the line marked for the "physician" signature, thereby approving the plan of care. Next to his signature on the physician approval line, **MIRZA** would typically write "meds to be monitored and prescribed by PCP," referring to the Primary Care Physician – an acknowledgment by **MIRZA** that he was not authorized or medically competent to prescribe medicines for the beneficiaries and that he was not their physician.

38. The plans of care that **MIRZA** received and signed sometimes had the exact same cookie-cutter language for each beneficiary, especially the narrative paragraph describing the home environment and support system. For example, each plan of care GLOBAL sent to **MIRZA** described the beneficiary as "Patient home and environment clean and conducive to live in. Patient lives alone during the day and family members only come to check after work. PCA services will be beneficial during the day. . . . PCA services will help the patient stay home and meet up with ADLS." **MIRZA** signed these plans of care even though he knew they were incorrect, such as when the beneficiary was homeless and therefore could not receive PCA care at home as **MIRZA** prescribed.

39. During the course of the fraud scheme, **MIRZA** signed hundreds of intakes and plans of care, and in exchange collected at least $48,450 in cash payments from PCAs. Seeing D.C. Medicaid beneficiaries and signing their intakes became **MIRZA**'s primary source of income. For instance, in the first five days of April 2013, **MIRZA** saw 35 D.C. Medicaid beneficiaries, collecting a total of $4,375, but only three actual non-Medicaid patients, for which he collected a total of $75.

40. Among others, on or about the dates indicated below, **MIRZA** signed the following intakes and plans of care for the identified D.C. Medicaid beneficiaries:

| Home Care Agency | D.C. Medicaid Beneficiary Initials | Intake Date | Plan of Care Date | Prescribed # Hours / # Days |
|---|---|---|---|---|
| ABA | N.W. | 5/18/2013 | 4/16/2013 | 8 hours / 7 days |
| ABA | M.G. | 4/30/2013 | 5/30/2013 6/12/2013 | 8 hours / 7 days |
| AMERICAN QUALITY | L.W. | 2/01/2013 | 2/22/2013 3/12/2013 | 8 hours / 7 days |
| AMERICAN QUALITY | A.T. | 2/13/2013 | 3/08/2013 | 8 hours / 7 days |
| AMERICAN QUALITY | P.S. | 1/15/2013 | 2/28/2013 3/08/2013 | 8 hours / 7 days |
| GLOBAL | M.S. | 4/30/2013 | 6/12/2013 | 8 hours / 7 days |
| GLOBAL | L.S. | 4/03/2013 | 5/11/2013 | 8 hours / 7 days |
| GLOBAL | P.W. | 4/15/2013 | 4/30/2013[1] 5/11/2013 | 8 hours / 7 days |
| GLOBAL | M.Y. | 4/30/2013 | 5/29/2013 | 8 hours / 7 days |
| JD NURSING | D.W. | 2/27/2013 | 3/15/2013 | 8 hours / 7 days |
| JD NURSING | T.Q. | 2/13/2013 | 2/13/2013 | 8 hours / 7 days |
| JD NURSING | T.H. | 1/25/2013 | 2/13/2013 | 8 hours / 7 days |
| NURSING ENTERPRISES | W.S. | 1/07/2013 | 2/01/2013 2/13/2013 | 8 hours / 7 days |
| NURSING ENTERPRISES | G.Y. | 4/24/2013 | 6/12/2013 | 8 hours / 7 days |
| ULTRA | M.W. | 2/27/2013 | 3/18/2013 | 8 hours / 7 days |

---

[1] The plan of care **MIRZA** signed on 4/30/2013 was sent to ABA; the second plan of care was sent 12 days later to GLOBAL.

| Home Care Agency | D.C. Medicaid Beneficiary Initials | Intake Date | Plan of Care Date | Prescribed # Hours / # Days |
|---|---|---|---|---|
| ULTRA | C.P. | 2/08/2013 | 6/05/2013 | 8 hours / 7 days |
| VIZION | R.P. | 4/17/2013 | 4/30/2013 | 8 hours / 7 days |
| VIZION | S.T. | 4/05/2013 | 5/07/2013 | 8 hours / 7 days |
| VIZION | M.B. | 3/13/2013 | 3/30/2013 | 8 hours / 7 days |

41.     **MIRZA** prescribed personal care services to D.C. Medicaid beneficiaries even though he was not legally or medically qualified and could not determine whether the services were medically necessary.  For example, in one instance, **MIRZA** signed an intake and a plan of care where the diagnosis was "legal blindness" and "perpetual vision impairment," a medical condition that **MIRZA** as a chiropractor is not trained or licensed to diagnose or treat.

42.     On other occasions, when HCAs wanted a new intake because the prior one was too old, the HCAs would send **MIRZA** a new intake, often completely filled out, and **MIRZA** would sign the intake without seeing the beneficiary and then return the signed intake to the HCA.

43.     HCAs obtained the intakes and plans of care signed by **MIRZA** to support and justify their claims for payment to Medicaid for purportedly delivering medically necessary personal care services, even though the intakes and plans of care were invalid on their face because they were not prescribed or signed by a physician as required.

**Defendant's Obstruction of the Government's Criminal Health Care Fraud Investigations**

44.     Beginning on March 14, 2014, and continuing until at least on or about April 10, 2014, the exact date being unknown, in the District of Columbia and elsewhere, the defendant, **REHMAN MIRZA, D.C.**, did willfully prevent, obstruct, mislead, delay, and attempt to prevent, obstruct, mislead, and delay the communication of information or records relating to a

violation of a Federal health care offense, specifically, the Medicaid fraud scheme described above, to a criminal investigator.

45. On March 14, 2014, at approximately 5:57 p.m., Special Agents of the Federal Bureau of Investigation ("FBI") arrived at **MIRZA**'s office in Suitland to serve a subpoena. **MIRZA** accepted service of the subpoena and talked with the agents in his office.

46. During that meeting, **MIRZA** admitted that he knew what prescriptions for home care services were, but denied that he had any involvement in Medicaid. **MIRZA** and the agents also discussed **MIRZA**'s sole office assistant, and the agents made clear to **MIRZA** that they intended to speak with her later.

47. At approximately 6:34 p.m., about half an hour after they arrived, the agents concluded the interview and departed **MIRZA**'s office.

48. At approximately 6:57 p.m., **MIRZA** and his office assistant departed the office and locked it up for the evening. **MIRZA** offered to drive his assistant home.

49. During that car ride – the entirety of which was recorded on audio-video surveillance – over the course of the next 45 minutes, **MIRZA** repeatedly attempted to obstruct the Government's investigation, specifically by attempting to influence his assistant's statements to the FBI, telling the assistant not to use certain words, encouraging and suggesting that she not be fully truthful, and ensuring that their stories would match so that **MIRZA** would not be "implicated" by his assistant. For example, **MIRZA** tried to convince his assistant they had nothing to do with Medicaid, or instructed the assistant not to say the word "Medicaid," at least ten times during the course of the 45-minute conversation.

50. **MIRZA** began by explaining to his assistant that the PCAs "figured out some kind of crime ring." But then he attempted to assure his assistant, "We had nothing to do with

Medicaid . . . so we're cool." However **MIRZA** then admitted during the recorded conversation with his assistant that he knew the scheme was based on kickbacks: he explained that the PCAs were getting paid by the HCA[2] for each patient they brought in, "like $400 each," and then the PCAs would pay the doctor out of that money and keep the rest as profit. **MIRZA** explained that he had to "cooperate with FBI because I don't want to look like I'm implicated."

51.     At approximately 7:08 p.m., **MIRZA** admitted his knowledge that Medicaid was being billed for PCA services he prescribed: "All I know is [HCAs] billing Medicaid and I think billing Medicaid for services not provided."

52.     But **MIRZA** tried to reassure his assistant, saying the FBI was "not after us, we're small fish."

53.     **MIRZA** then began instructing his assistant what to say and not say when interviewed by the FBI. "They're going to ask you, how long did the exams take? Say 45 minutes to an hour . . . ."

54.     **MIRZA** repeatedly admonished his assistant: "Don't give up information. Just answer their questions. . . . *Do not use the word Medicaid*." "Again, you keep using the word Medicaid. We never took Medicaid."

55.     When his assistant responded by asking what the intakes were that **MIRZA** signed, **MIRZA** replied, "That's a health care prescription for the D.C. Medicaid system. . . . *That's what they would submit to Medicaid to get paid*."

56.     When his assistant kept referring to Medicaid forms, **MIRZA** scolded the assistant: "I'm going to make sure you don't keep that – get this Medicaid thing out of your

---

[2] Throughout the conversation **MIRZA** used the words "nursing home" when referring to the home care agencies.

mind . . . . Because it's Medicaid fraud that they're after." He then reiterated, "We had nothing to do with Medicaid. *Which you know*," emphasizing the last few words.

57.   **MIRZA** explained the pieces of paper he signed were "prescriptions for home health care. . . . So that was submitted, then the nurse would send back the plan of care . . . which remember 4 or 5 pages. I would sign off on that. And then they would do whatever they want with that. . . . They got greedy."

58.   **MIRZA** then continued to try to influence what his assistant would say to the FBI. "They're going to ask what time period. And [say] I don't remember."

59.   When his assistant started to mention the receipts and the "cash given to us by the home health aides–" **MIRZA** interrupted and said, "Don't even bring that up. They didn't ask me so why would they ask you? . . . .You just tell them that I collected payments, if they ask you. That's all." He then instructed further on what to say: "Just tell them you know that Dr. Mirza would just you know evaluate them, he would take them in the back, and he would be with them for about an hour, and then he would fill out the paperwork and he would fax, sometimes he would ask me to fax … and then sometimes faxes would come back …"

60.   When his assistant asked why the FBI was subpoenaing them if they were not part of Medicaid, **MIRZA** replied "because we submitted plans of care which they used – which they used – to submit to Medicaid." He then explained, "that was the part that they did wrong. . . . I don't know what they did, I don't care what they did. Whatever they did, they did something illegal."

61.   **MIRZA** informed his assistant that the FBI wanted to make certain there "was no kickback," so "don't keep saying it was all cash. It was just we took payments from the patients

for the exams and that was it," although **MIRZA** knew that this was false, and that the payments came from the PCAs.

62. **MIRZA** then guided the assistant further, warning, "you're supposed to be honest, but the thing is you gotta be careful what you say because I don't want you to get me implicated. That's why I want you to be very careful not to say Medicaid."

63. Trying to reassure the assistant that the assistant would not get into trouble, and would therefore not need to talk with the FBI, **MIRZA** said, "You see what our operation is. We're nothing. Why would the FBI bother with us? They only go after big fish. They only go after big fish." "If they were to send either one of us to jail, it's actually going to cost them more to put us in there. . . . That's why they go after the rich people. They have no incentive to go after us."

64. The assistant then asked **MIRZA** what to say if the FBI asked about people getting discounts. Instead of telling the assistant to be honest, **MIRZA** instead coached the assistant to mislead the FBI: "You don't remember. I don't remember. . . . Say I don't know, I don't remember."

65. **MIRZA** explained that his assistant didn't have to worry because he made the assistant seem stupid and simple, explaining to the FBI that the assistant was new, had only had one previous job – working at Burger King – and didn't even know how to use a facsimile machine.

66. **MIRZA** then again instructed his assistant what *not* to say: "Just don't use the word Medicaid, that's all. . . . That's the No-No word." "We didn't have anything to do with Medicaid. . . . Just don't say Medicaid."

15

67. When the assistant asked again about the money they received from the PCAs, instead of the beneficiaries, **MIRZA** told the assistant to lie: "But don't mention that. At least say that it came from the patient."

68. **MIRZA** explained the fraud scheme to the assistant: "This is the thing, Medicaid was paying them. So they had every incentive to keep doing more and more and more and more. They're like, hey this is free money from the government."

69. Approximately ten minutes later, at 7:44 p.m., **MIRZA** explained, "I'm not trying to hide anything …. Just don't use the Medicaid word. That's all. Everything's all cash based. . . . It's fee for service. They gave me a fee, I provided a service. That's what cash is."

70. The assistant then exited the vehicle and the conversation soon ended.

**(Obstruction of Criminal Health Care Fraud Investigations, in violation of Title 18, United States Code, Sections 1518.)**

DATED: May 12, 2015

VINCENT H. COHEN, JR.
ACTING UNITED STATES ATTORNEY

By: /s/ Theodore L. Radway

Theodore L. Radway (D.C. Bar No. 473034)
Assistant United States Attorney
555 4th Street, N.W. – Room E4913
Washington, D.C. 20530
Tel: 202.252.7874
Fax: 202.252.2599
Ted.Radway@usdoj.gov